UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NERINGA PUMPUTYTE, on behalf of herself and all others similarly situated, | )<br>)<br>) 16 C 4868<br>)<br>) Judge Gary Feinerman<br>)<br>)<br>)<br>)<br>) |
| Plaintiff, | |
| vs. | |
| UNITED AIRLINES, INC., | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Lilija Pumputiena brought this suit on behalf of herself, her then-minor child Neringa Pumputyte, and four putative classes against Deutsche Lufthansa and United Airlines, alleging breach of contract and violation of the Convention for the Unification of Certain Rules for International Carriage by Air ("Montreal Convention") in connection with a June 2015 flight on United from Chicago, Illinois to Brussels, Belgium, and ensuing travel on Lufthansa from Brussels to Vilnius, Lithuania. Doc. 7. The court dismissed all claims against Lufthansa and some claims against United. Docs. 37-38 (reported at 2017 WL 66823 (N.D. Ill. Jan. 6, 2017)). Pumputiena filed an amended complaint, Doc. 43, and after United argued that the amendment contravened the dismissal order, Doc. 45, Pumputyte, no longer a minor and proceeding in her own name, filed a second amended complaint. Doc. 48. United then filed a motion to dismiss and to strike parts of the second amended complaint, Doc. 50, which the court granted in part and denied in part, Docs. 70-71 (reported at 2017 WL 2243095 (N.D. Ill. May 23, 2017)).

United now moves for summary judgment on the remaining claims. Doc. 87. While that motion was pending, Pumputyte moved for class certification on one of those claims. Doc. 105. The summary judgment motion is granted and the class certification motion is denied.

1

**Background**

The following facts are stated as favorably to Pumputyte as permitted by the record and Local Rule 56.1. *See Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). In considering United's motion, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

On June 7, 2015, Pumputyte was a passenger on United Airlines Flight 972 from O'Hare International Airport in Chicago, Illinois to Brussels Airport in Brussels, Belgium. Doc. 89 at ¶ 12; Doc. 113-2 at ¶ 12. Her ultimate destination was Vilnius, Lithuania. Doc. 89 at ¶ 3; Doc. 113-2 at ¶ 3. UA 972 was scheduled to depart Chicago at 6:25 p.m. and to arrive in Brussels at 9:35 a.m. Doc. 89 at ¶ 13; Doc. 113-2 at ¶ 13. The flight left the gate at 6:33 p.m., eight minutes behind schedule. Doc. 89 at ¶ 14. (Pumputyte denies this fact, citing her affidavit, Doc. 113-2 at ¶ 14, but the affidavit, Doc. 113-1, does not address UA 972's delayed departure from the gate, so the fact is deemed admitted. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("[W]here a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial."); *Schwab v. N. Ill. Med. Ctr.*, 42 F. Supp. 3d 870, 874 (N.D. Ill. 2014) ("[T]he court will disregard any of Schwab's assertions … that are not supported with specific record citations.").)

UA 972 was scheduled to taxi for 27 minutes before taking off. Doc. 89 at ¶ 15. (Pumputyte denies this fact, citing her affidavit, Doc. 113-2 at ¶ 15, but the affidavit does not address UA 972's scheduled taxi time at O'Hare, so the fact is deemed admitted.) Due to directives from air traffic control in Chicago, UA 972 actually taxied for 87 minutes, 60 minutes longer than scheduled. Doc. 89 at ¶¶ 15, 17-18. (Pumputyte denies this fact, citing her affidavit,

Doc. 113-2 at ¶¶ 15, 17-18, but the affidavit does not address UA 972's actual taxi time at O'Hare, so the fact is deemed admitted.) Because federal law obligated UA 972 to follow air traffic control's directives, United could not avoid that 60-minute delay. Doc. 89 at ¶ 18. (Pumputyte denies this fact, citing her affidavit, Doc. 113-2 at ¶ 18, but the affidavit does not address the need to comply with air traffic control directives in the United States, so the fact is deemed admitted.)

Although UA 972 was scheduled to fly from Chicago to Brussels in 458 minutes, it made the journey in 441 minutes, making up seventeen minutes of the on-the-ground delay at O'Hare. Doc. 89 at ¶ 20. (Pumputyte denies this fact, citing her affidavit, Doc. 113-2 at ¶ 20, but the affidavit does not address UA 972's actual or scheduled flight time, so the fact is deemed admitted.) Upon arriving in Brussels, UA 972 was scheduled to taxi for five minutes, but it actually taxied for ten minutes. Doc. 89 at ¶ 16. (Pumputyte denies this fact, citing her affidavit, Doc. 113-2 at ¶ 16, but the affidavit does not address UA 972's actual or scheduled taxi time in Brussels, so the fact is deemed admitted.) As with the taxi delay in Chicago, this five-minute delay was attributable to directives from air traffic control. Doc. 89 at ¶ 17. (Pumputyte denies this fact, citing her affidavit, Doc. 113-2 at ¶ 17, but the affidavit does not address the need to comply with air traffic control directives in the European Union, so the fact is deemed admitted.)

Pumputyte's connecting flight to Vilnius was scheduled to depart at 10:45 a.m. Doc. 89 at ¶ 24; Doc. 113-2 at ¶ 24. Had her flight from Chicago arrived in Brussels at the scheduled arrival time of 9:35 a.m., she would have had 70 minutes to make the connection. Doc. 89 at ¶ 24; Doc. 113-2 at ¶ 24. But UA 972 arrived in Brussels at 10:31 a.m., 56 minutes late, giving her only fourteen minutes to make the connection. Doc. 89 at ¶ 24; Doc. 113-2 at ¶ 24. Anticipating this delay, and consistent with company policy, United rerouted Pumputyte on the

next available flight to Vilnius, a Lufthansa flight making a connection in Frankfurt, Germany. Doc. 89 at ¶¶ 25-27. (Pumputyte denies this fact, citing her affidavit, Doc. 113-2 at ¶¶ 25-27, but the relevant portions of her affidavit state only that United "negligently amended" Pumputyte's travel plans "in total disregard of [her] travel related plans and possibility of her boarding her original connecting flight," Doc. 113-1 at ¶¶ 4-6; *see also id*. at ¶¶ 11-12. Because these are solely legal arguments, the fact is deemed admitted. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts. … The district court was correct that by labeling the charts 'fraudulent transfers,' Judson Atkinson made an improper legal argument since whether or not any transfers were fraudulent is a legal conclusion. In striking the exhibits, the court acted within its discretion in interpreting its own local rules."); *Cady v. Sheahan*, 467 F.3d 1057, 1060-61 (7th Cir. 2006) (holding that the district court did not abuse its discretion in disregarding the plaintiff's "statement of material facts" because it "did not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"); *J & J Sports Prods., Inc. v. Pantchev*, 2013 WL 6050168, at *1 (N.D. Ill. Nov. 15, 2013) (same).)

As it turned out, Pumputyte's originally scheduled flight from Brussels to Vilnius was delayed by 40 minutes, giving her time to make the connection despite her late arrival from Chicago. Doc. 89 at ¶ 28. (Pumputyte denies this fact, citing her affidavit, Doc. 113-2 at ¶ 28, but the affidavit undermines her denial, averring that "her connecting flight from Brussels to Vilnius was late on departure" and so "was still by the gate" when she deplaned in Brussels, Doc. 113-1 at ¶ 4.) When Pumputyte arrived at the gate, Lufthansa employees refused to let her board. Doc. 89 at ¶ 29. (Pumputyte denies this fact, citing her affidavit, Doc. 113-2 at ¶ 29,

4

which avers that "she was not allowed *by United* to board her connecting flight to Vilnius," Doc. 113-1 at ¶ 5 (emphasis added).  Because Pumputyte's deposition testimony clearly contradicts her affidavit on this point, Doc. 89-4 at 17-18 (testifying that she gave her boarding pass to a Lufthansa gate agent, who did not permit her to board, and then spoke to United employees only afterwards), and because she does not even attempt to explain the discrepancy, the fact is deemed admitted.  *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999) (noting that lower courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity"); *Velez v. City of Chicago*, 442 F.3d 1043, 1049 (7th Cir. 2006) ("A party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony.  Consequently, where a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.") (citation, alterations, and internal quotation marks omitted).)  United provided Pumputyte with a meal voucher for use in the Brussels airport.  Doc. 89 at ¶ 27.  (Pumputyte denies this fact, citing her affidavit, Doc. 113-2 at ¶ 27, but the affidavit does not address United's offer of a meal voucher, and Pumputyte admitted during her deposition that she used one, Doc. 89-4 at 4, so the fact is deemed admitted.)

Due to further delays unconnected with UA 972, Doc. 48 at ¶ 9, Pumputyte ultimately spent several additional hours in the Brussels airport before flying to and arriving in Vilnius on

5

June 8, 2015, Doc. 89 at ¶ 33; Doc. 113-2 at ¶ 33. During the delay in Brussels, she incurred expenses buying snacks, water, and medicine, and calling her parents. Doc. 89 at ¶¶ 32, 39; Doc. 113-2 at ¶¶ 32, 39.

Pumputyte checked one bag on UA 972. Doc. 89 at ¶ 35; Doc. 113-2 at ¶ 35. The bag was delivered in damaged condition to her grandparents' home in Vilnius the day after she arrived. Doc. 89 at ¶¶ 32, 37; Doc. 113-2 at ¶¶ 32, 37.

## Discussion

As a result of the court's dismissal orders, two claims remain. Count I of the operative complaint is an individual and class claim under Article 19 of the Montreal Convention for damages caused by the delay of UA 972. Doc. 48 at ¶¶ 93-115. Count III is an individual claim for loss and delay of checked baggage under Article 17 (the claim's heading says "Article 19," but the substance places it within Article 17) and Article 22(2) of the Montreal Convention. *Id*. at ¶¶ 143-152.

**I.    Count I: Article 19 Claim**

Article 19 of the Montreal Convention provides:

> The carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo. Nevertheless, the carrier shall not be liable for damage occasioned by delay if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage or that it was impossible for it or them to take such measures.

Montreal Convention art. 19. "[T]o satisfy Article 19's requirement that all reasonable measures required to avoid the delay be taken, the defendant carrier must show that, on the whole, it took measures reasonably available and reasonably calculated to prevent the subject loss." *Dochak v. Polskie Linie Lotnicze LOT S.A.*, 2017 WL 2362570, at *8 (N.D. Ill. May 30, 2017) (citation and internal quotation marks omitted). The carrier need not show that it took "every possible precaution"; rather, it "need only show that it took all precautions that, in sum, were appropriate

to the risk." *Bernfeld v. US Airways, Inc.*, 2016 WL 1583057, at *2 (N.D. Ill. Apr. 20, 2016) (citation and internal quotation marks omitted); *see also Giannopoulos v. Iberia Lineas Aereas de Espana, S.A., Operadora, Sociedad Unipersonal*, 2012 WL 5499426, at *4 (N.D. Ill. Nov. 9, 2012) (same).

United's Local Rule 56.1(a)(3) statement and Pumputyte's Local Rule 56.1(b)(3)(B) response—Pumputyte did not file a Local Rule 56.1(b)(3)(C) statement—are the only means of presenting facts on summary judgment. *See FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005) ("We have noted before that rules like 56.1 provide[] the only acceptable means of disputing the other party's facts and of presenting additional facts to the district court.") (alteration in original, internal quotation marks omitted); *Perez v. Town of Cicero*, 2011 WL 4626034, at *2 (N.D. Ill. Sept. 30, 2011) ("Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion."). Neither United's statement nor Pumputyte's response identify any record evidence undermining United's submission that, because its pilots were obligated to follow air traffic control's orders, it was not responsible for UA 972's 56-minute delay in arriving in Brussels. Rather, the undisputed facts show that, while the eight-minute delay in leaving the gate at O'Hare was United's fault, United more than made up those eight minutes in flight, and also that responsibility for the remaining delays on the ground at O'Hare and in Brussels were attributable to air traffic control, whose directions United had to follow. Given this, no reasonable juror could find that United could have taken reasonable measures to avoid that delay. *See Dochak*, 2017 WL 2362570, at *10 (granting summary judgment in an Article 19 suit where "the undisputed facts establish that [the] delays were caused by unavoidable and unforeseen mechanical issues with the aircraft"); *Bernfeld*, 2016 WL 1583057, at *2 (same, where the

plaintiffs "d[id] not controvert US Airways' assertion that the bird strike that took aircraft 507 out of service was unpredictable and unavoidable. Nor d[id] they offer any evidence controverting US Airways' evidence that it attempted to substitute another aircraft but that no suitable aircraft were available and that the only remaining option was to rebook the Bernfelds on the next available flight. The Bernfelds offer[ed] no argument, let alone evidence, identifying any reasonable measure that US Airways could have taken, but failed to take, in order to avoid or minimize the delay in the Bernfelds' travel").

The only remaining question is whether a reasonable juror could find that it was unreasonable for United—in anticipation of UA 972's delayed arrival in Brussels, which would have left Pumputyte with only fourteen minutes to make her connection to Vilnius—to reroute her onto a later flight to Vilnius and provide her with a meal voucher, even though, as it turned out, the original connecting flight ultimately was delayed long enough that it would have been possible for her to make that flight. Pumputyte contends that United's decision was "negligent" and "reckless." Doc. 113 at 8. But Pumputyte points to nothing in the record suggesting that United knew about the delay in her originally scheduled Brussels-to-Vilnius flight and rerouted her anyway, or even that the delay had manifested itself at the time United rerouted her, let alone that United should have predicted the delay and known that it would prove durable. Nor does Pumputyte identify anything in the record suggesting that United could or should have anticipated or avoided additional delays in Pumputyte's re-booked flight from Brussels. Absent such evidence, no reasonable juror could find that United acted unreasonably in taking precautions (rerouting her and providing a meal voucher) to address the chance that she would have missed her originally scheduled connection due to UA 972's late arrival, and would then have been left without a booked seat on any later flights, thereby risking even further delay. *See*

8

*Dochak*, 2017 WL 2362570, at *9-10 (holding that, after the plaintiffs' flights were canceled, the airline acted reasonably under Article 19 "by working to rebook them on next available flights and providing them with food and lodging during the delay"); *Bernfeld*, 2016 WL 1583057, at *2 (granting summary judgment where the plaintiffs "offer[ed no] evidence controverting US Airways' evidence that … no suitable [replacement] aircraft were available and that the airline's only remaining option was to rebook the Bernfelds on the next available flight"); *Helge Mgmt., Inc. v. Delta Air Lines, Inc.*, 2012 WL 2990728, at *4 (D. Mass. July 19, 2012) ("No flights were available to Moscow after the cancellation of Flight 46 at 9:49 P.M. on December 29, 2010, and Delta took the reasonable measures of providing Uritsky with hotel and food vouchers, and re-booking him on a flight to his destination the following day.").

Pumputyte also contends that it was unreasonable for *United* to refuse to seat her on her originally scheduled *Lufthansa* flight from Brussels to Vilnius after she arrived at the Lufthansa gate with enough time to board. Doc. 113 at 9-10. But Pumputyte points to nothing in the record suggesting that United had any control over the Lufthansa gate agents' actions, or that United was unreasonable in failing to exercise such control. *Cf.* 2017 WL 66823, at *6 (noting that, under Article 36 of the Montreal Convention, United would be liable for Lufthansa's actions only if United expressly agreed to assume liability for the whole journey, and noting further that the complaint lacked such an allegation); *Best v. BWIA W. Indies Airways Ltd.*, 581 F. Supp. 2d 359, 363 (E.D.N.Y. 2008) ("[T]he initial carrier does not become liable for an injury taking place on one of the successive legs of the trip merely by virtue of the fact that the traveler purchased tickets for the entire trip through that initial carrier."). Thus, there is no genuine issue of material fact as to that issue as well.

## II. Count III: Article 17 Claim

That leaves Pumputyte's Article 17 claim for damage to her checked luggage and United's delay in delivering it to her in Vilnius. Article 17 states in relevant part:

> The carrier is liable for damage sustained in case of destruction or loss of, or of damage to, checked baggage upon condition only that the event which caused the destruction, loss or damage took place on board the aircraft or during any period within which the checked baggage was in the charge of the carrier. However, the carrier is not liable if and to the extent that the damage resulted from the inherent defect, quality or vice of the baggage.

Montreal Convention art. 17(2). Article 17 further provides that the carrier is liable for a delay in delivering a passenger's checked bag only if it "has not arrived at the expiration of twenty-one days after the date on which it ought to have arrived." *Id*. art. 17(3).

Article 31 limits a carrier's liability for delayed and damaged luggage in two additional ways. First,

> [i]n the case of damage, the person entitled to delivery must complain to the carrier forthwith after the discovery of the damage, and, at the latest, within seven days from the date of receipt in the case of checked baggage and fourteen days from the date of receipt in the case of cargo. In the case of delay, the complaint must be made at the latest within twenty-one days from the date on which the baggage or cargo have been placed at his or her disposal.

*Id*. art. 31(2). Second, "[e]very complaint must be made in writing … ." *Id*. art. 31(3). Failure to comply with either requirement means that "no action shall lie against the carrier, save in the case of fraud on its part." *Id*. art. 31(4).

United's Local Rule 56.1(a)(3) statement asserts that: (1) "[t]here is no evidence of any records showing that [Pumputyte] contacted United or Lufthansa regarding checked luggage allegedly arriving in Vilnius later than [she] arrived in Vilnius"; and (2) she did not "contact[] United or Lufthansa regarding allegedly damaged luggage." Doc. 89 at ¶¶ 50-51. Pumputyte denies those assertions. Doc. 113-2 at ¶¶ 50-51. The denials are baseless, for in the portion of

her deposition that her Local Rule 56.1(b)(3)(B) cites in support, Pumputyte testified only that she made an *oral* complaint to airport officials in Vilnius once she realized her luggage was not there, Doc. 89-4 at 6, and her affidavit states only that she "lodged [a] missing luggage complaint" with United's "local Vilnius[] office," Doc. 113-1 at ¶ 34. Nothing in the record materials cited by Pumputyte supports the proposition that she contacted United again to complain about any damage to the luggage after she received it, nor that she made a complaint in writing about any luggage damage.

Accordingly, because Pumputyte identifies no record evidence showing that she made a complaint in writing about either the delay in delivering her luggage or the damage to the luggage, Article 31(3) precludes recovery for both. *See Nwokeji v. Arik Air*, 2017 WL 4167433, at *12 (D. Mass. Sept. 20, 2017) ("Article 31(3) expressly requires that notice be given in writing. Verbal or actual notice is insufficient as a matter of law.") (citation omitted); *Zurich Am. Ins. Co. v. Lan Cargo S.A.*, 2013 WL 7963678, at *2 (S.D.N.Y. Dec. 9, 2013) ("Article 31 does not require that any 'claim' be filed or that a formal 'claims procedure' be used. It simply requires that the carrier be given written notice that there is a problem for which it may be held liable, at a time when it is possible to conduct a meaningful investigation into how the damage was caused."); *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 496 (S.D.N.Y. 2009) (same, citing additional cases). And because there is no dispute that United delivered Pumputyte's luggage the day after she arrived in Vilnius, Doc. 89 at ¶¶ 32, 37; Doc. 113-2 at ¶¶ 32, 37, Article 17(3) independently forecloses any damages for the delay. *See Candelo v. Am. Airlines*, 2010 WL 1743964, at *1 (W.D. Ky. Apr. 28, 2010) ("The right of action for a missing bag [under Article 17(3)] does not accrue until the luggage is gone for 21 days or more. Here the plaintiffs' first claim relates to baggage that was delayed only four days. They therefore have no

cause of action and the portion of their complaint that relates to that four-day delay must be dismissed."); *Molefe*, 602 F. Supp. 2d at 496 (citing Article 17(3) in holding that "[t]he delay claim would have to be dismissed on the substantive ground that plaintiff received his luggage well within twenty-one days after his flight").

**Conclusion**

United's summary judgment motion is granted, and its motion to strike portions of Pumputyte's affidavit, Doc. 115, is denied as moot. Because her claims have been dismissed, Pumputyte's class certification motion, which pertains only to her Article 17 claim, is denied. *See Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533, 538 (7th Cir. 2011) ("It takes a representative with a live claim to carry on with a class action."); *Shipp v. Memphis Area Office, Tenn. Dep't of Emp't Sec.*, 581 F.2d 1167, 1172-73 (6th Cir. 1978) ("This complaint must be dismissed as to the purported class … because the named plaintiff is not an appropriate class representative within the meaning of Rule 23(a), his individual claim having been dismissed form this action prior to any certification."). It is true that "[a] decision that the claim of the named plaintiff[] lacks merit" does not "invariably … disqualif[y] the named plaintiff[] as proper class representative[]." *Cowen v. Bank United of Tex., FSB*, 70 F.3d 937, 941 (7th Cir. 1995). Here, however, the basis for dismissing Pumputyte's Article 17 claim almost certainly would "apply equally to any other member of the class." *Ibid*. Because that claim "can quickly be shown to be groundless," it makes sense "to skip certification and proceed directly to the merits." *Thomas v. UBS AG*, 706 F.3d 846, 849-50 (7th Cir. 2013); *see also* 3 William B. Rubenstein, *Newberg on Class Actions* § 7:8 (5th ed. 2017) (noting that "if a court grants a dispositive motion before class certification, it may preclude the need to rule on certification at all thereafter," and that "the emerging trend in the courts appears to be to decide dispositive

motions prior to the certification motion"); *id*. at § 7:10 ("[C]ourts have been willing to rule on motions for summary judgment prior to class certification in circumstances in which it would facilitate efficient resolution of the case."). In any event, Pumputyte does not contend that she would be prejudiced by the court's deciding the merits of her Article 17 claim before resolving her class certification motion, thereby forfeiting any such contention. Judgment will be entered in favor of United and against Pumputyte.

March 9, 2018

                                      United States District Judge